And we're ready to begin with the first case, which is Bozzuto's v. NLRB. Good morning. My name is Miguel Escalera, and I represent Bozzuto's, the appellant. If it please the Court, the substantial evidence of record demonstrates that Bozzuto's terminated Mr. Grecian for his repeated refusal to attend a work meeting, during work hours, while being paid, and subject to a promise that he would suffer no adverse action. That was a termination for cause. In this case, we know exactly what was said between Bozzuto's and Mr. Grecian, because Mr. Grecian made a surreptitious recording of his interactions with his managers on October 8, 2013. That recording provides irrefutable evidence that Mr. Grecian's superiors tried their best to convince him to attend the meeting and keep his job. Importantly, that recording shows the following interaction between Mr. Grecian and Bozzuto's manager of employee relations. Mr. Grecian, quote, right, okay, I guess so it's termination if I don't go to the meeting, correct? And it's non-termination if I do go to the meeting, right? Mr. Vaughn, quote, yeah, you're not going to get terminated upstairs. Mr. Vaughn, quote, but I'm telling you now, and I don't want to delay it anymore, but if you absolutely refuse to go upstairs, there's nothing here that is unsafe or discriminatory or harassment in this meeting, because we're paying you, because you're not going to lose. You're not going to lose incentive. You're going to get downtime away. Good stuff. We're not going, we're not doing anything negative to you. If you don't do it, that's considered insubordination. Finally, after repeated attempts to get Mr. Grecian to attend the meeting, and three refusals by Mr. Grecian to attend the meeting, he confirmed that he would not attend. Mr. Vaughn, quote, so it's your choice now. Mr. Grecian, quote, yeah, my choice is not to go to the meeting. That was insubordination. Excuse me, am I right in understanding that the meeting was organized for Mr. Grecian's benefit to explain to him how the production standards were working? Yes. Why does it make sense to discharge someone for not attending a meeting that was organized for that person's benefit? It was insubordination for him to refuse to attend the meeting. The meeting was triggered by Mr. Grecian's false accusations that morning that the company was changing its production standards on a daily basis to cheat employees out of incentive pay. That was Mr. Grecian's position, and he stated that he was telling everybody who would listen that that was the case. It's undisputed that that is false. These production standards are developed based on time studies that take months to develop, and they're posted on the employee bulletin boards. In response to Mr. Grecian's statement as to his belief that the company was a wage cheat and the company was changing the production standards on a daily basis on busy days to cheat employees, the company said, we're going to direct you to attend a meeting at which the industrial engineers will attend, and they'll explain how it takes months to prepare these standards. But if that was the, and help me understand the record better, that's why we're here, if that was the employer's interest in making sure that the information was miscorrected and the employees were not given false information that they were being cheated, wouldn't there be some action after his discharge to make sure that that information had not disseminated and that employees were, had not been provided with incorrect information? No, Your Honor. Mr. Grecian had had many meetings in the past in which he had complained about production standards, and he had met with Bizzuto's, and they had explained production standards to him, including earlier in 2013, and he had suffered no adverse action from attending those meetings. And this was simply going to be another one of those meetings. It was Mr. Grecian who was under making these false statements. It was not the rest of the workforce. It did not call for Bizzuto's to be required to conduct a company-wide training program. It was Mr. Grecian who was the one who was making these false statements. And they were, there's no dispute in the record but that those statements were false. The majority found that Grecian's dismissal on October 8th was related to the October 1st warning. Why isn't there substantial evidence to support that? Thank you, Your Honor. There is no substantial evidence that he was terminated on October 8th because of anything that happened on October 1st. Mr. Grecian, from November 11, 2010 to September 17, 2013, all before the start of union organizing, had been disciplined by Bizzuto 16 times. He had received nine verbal warnings. He had received four written warnings. He had received three one-day suspensions. None of those disciplinary actions resulted in Mr. Grecian's termination, and neither did the verbal warning he received on October 1st. He received a verbal warning, the very lowest level of discipline you can receive. If they were going to terminate him, they would have suspended him pending termination. He wasn't terminated on October 2nd, 3rd, 4th, 5th, or 6th, or 7th. It was over. He got a verbal warning and it was done. There were significant intervening events that resulted in his termination. Didn't both the October 1st intervention and the October 8th concern production standards? I mean, this is only seven days later, and the interactions were about the same issue. Your Honor, they were respectfully about completely different issues. On October 1st, there was a meeting held because employees were complaining about Mr. Grecian's scary and erratic behavior. He was an employee who was ranting, who was agitated, who prior to the meeting had engaged in an altercation with his supervisor when he asked for some time off and the supervisor told him that he didn't have any time off to take, and he told the supervisor, I don't like you and I don't like the way you do business. Employees were complaining to Mr. Clark that Mr. Grecian was becoming increasingly erratic and scary, and so they called him into a meeting, and they told him, we have an obligation to maintain a safe workplace, and you're behaving in a way that's inappropriate. And he said, when people tell me that I'm doing something wrong, it makes me feel like I'm being forced to the ground, and I want to get up and do the same thing to the person that's doing it to me. They had a legitimate reason for calling him in to talk to him. Now, during that meeting, they said, going forward, we would like you to address issues with management, and we don't want you making statements like, I'm working 20 hours a day or I need three legs to do my job. That statement by management was an unfair labor practice because it had the effect of discouraging him from speaking to coworkers about potentially concerted activities, and we admit that that statement should not have been made. But there was no concerted activity by Mr. Grecian on October 1st, and the issue that Mr. Grecian was spoken to on October 1st was complaining or griping about being too busy. That is entirely distinct from what happened on October 8th, when Mr. Grecian approached management and said, you are wage cheats. You are cheating employees out of money by changing the production standards on a daily basis. Those are night and day. Those are not the same event. And in any event, they didn't terminate him for accusing them of being wage cheats. They could have. They could have said, if that upset them so much, they could have said, you're fired. And then that would have been the reason for his termination. But they didn't. They said, we're going to have you go to a meeting with our industrial engineers. They're going to show you that it takes months to develop these standards and that we can't possibly change them on a daily basis to cheat people out of incentive pay. They're posted on the bulletin board. We're not cheating employees, so you need to attend the meeting. And they tried... Can I ask one question? I know your time has expired. One question. In your briefing, you seem to imply that, with regard to Mr. McCarty, that he had a duty to present the photographs of his altered time records to Bazutos, rather than presenting that evidence to the NLRB. Is that your argument, that it was an unfair process somehow for him to not show that his time records had been altered and show the photographs to Bazutos? No, thank you, Your Honor. It is not. Our position is that, in the past, Mr. McCarty, when he raised wage issues, had his records corrected. And in the prior year, 11 employees had been terminated for the same production deficiency that he was terminated for. Our position is that, had he come forward with the information, he would not have been terminated, based on the substantial evidence of record. And when he did come forward, it was immediately investigated, and he was offered reinstatement with full back pay, without having to waive any claims. Am I right in understanding still that he was terminated for being at 94% for one week, rather than 95% the standard? And he was a long-term employee? Is that correct? That's correct. He was a long-term employee who was now receiving his 4th production warning. And other employees with 94% on a particular warning are also terminated. It is a consistent pattern. 11 employees were terminated for the very same thing prior to the start of union organizing. They're very strict about it. You get 4 warnings, and then you're terminated. Thank you. Good morning, Your Honor. David Seid to the Labor Board. At the outset, the company filed no exceptions before the Board that employee Gretchen was unlawfully warned on October 1st not to discuss production standards with other employees. This Court has no jurisdiction to consider any challenge to that, and for the company to now claim before this Court that somehow Gretchen had been acting inappropriately or making inappropriate comments, the Board soundly rejected that claim, and again, it's simply not before this Court. Substantial evidence also supports the Board's finding that the purported reason for the October 8th meeting to discuss production standards with Mr. Gretchen doesn't withstand scrutiny, that it was a pretext, and there are two primary points for why the Board made that finding. First, the Board reasonably found that this meeting was simply not structured in the way that a typical meeting would be designed to discuss production standards. The person from Industrial Standards that was told to attend the meeting, Jamie Wright, gave extensive testimony set forth in the Board's decision and at page 41 of the Board's brief that he didn't know why he was asked to be there, he tried to ask for clarification, was never given clarification, and that the whole thing was just really confusing and made no sense to him. And I would also point out that the company's brief to this Court have never... Wouldn't this be a fairly unusual meeting? And you can correct me if I'm misunderstanding the record, but it would not be usual to have an employee say there's cheating going on here and employees are being cheated and an industrial engineer would be called on to explain the situation. So I'm not sure what the... He may have said the meeting was unusual, but what would be the usual... Your Honour, the usual point would be that the industrial engineer would have been told the purpose for the meeting to prepare any notes or information that he would need to address the concerns being raised. Here, the company never provided the industrial engineer with that information despite the industrial engineer specifically asking, what do you need me for this meeting? Why am I being asked to attend this meeting? And as stated in the Board's decision and in the Board's brief, that engineer gave extensive testimony that the whole thing was just fuddling and confusing to him. And I would stress that even though that's a central underpinning of the Board's decision for why this meeting was a pretext and why it doesn't withstand scrutiny, the company's briefs never, ever address that point. And now for the first time, the second point that the Board relied on was that if the company really had such concerns that Mr. Gretchen was providing incorrect information to fellow employees, that it would have taken some steps to address those concerns. At argument this morning, it's the first time that the company has ever made any attempt to answer that part of the Board's decision. Its briefs were simply absent with respect to any attempt to address, again, a very key central underpinning of the Board's decision as to why, or the Board's finding, as to why the October 8th meeting or the purpose of the purported October 8th meeting simply doesn't withstand scrutiny. How long had Mr. Gretchen been working at the company when this incident arose? Your Honor, I am not sure that the record specifically states when he started his employment and if he did, I apologize, I don't recall. And I would also note that to the extent the company before this Court this morning has tried to challenge Gretchen's overall work record, that is simply not something that the company made any attempt to rely on before the Board or in its briefs to this Court. Was it in the record before the Board? His work record, I believe it would have been before the Board, correct, in the record. And are you familiar with it, was it 16 disciplinary warnings, four verbal warnings in 16 disciplines? Your Honor, I would have no reason to dispute what has been presented to the Court, but I can't particularly state having not reviewed that information before this argument. How should we understand the apparently undisputed fact that Gretchen was explicitly warned that he would be terminated if he didn't attend the October 8th meeting and was reassured several times that nothing bad would happen if he did? Your Honor, he was told that he would not be discharged. He was never told that he wouldn't be disciplined. And the context of the statement that nothing bad would happen to you was in the context of the company telling him, and I believe this is at page 647 of the appendix, was in context of Mitchell Gretchen being told that he would be paid for attending the meeting and that he wouldn't lose any downtime for attending the meeting so it wouldn't affect his productivity statistics. But he was never actually told that he would not in any way face discipline. And again, I can't overemphasize that this meeting is coming in context of an October 1 admitted unlawful warning where he is told not to discuss production standards with his fellow employees or face further discipline. And at that meeting, he was actually encouraged to simply resign from the company. So now a week later, after raising some additional concerns and again telling the company that he's continuing to tell fellow employees what he feels are improper manner that the company is handling its production standards, he's being called into another meeting. And there is ample justification for the board as set forth to find that the reported reason of that meeting to discuss production standards simply doesn't withstand scrutiny and that it's simply a pretext. With regard to the read aloud aspect of the order, could you enlighten us? It's a fairly high standard that has been articulated for imposing such a remedy, and it's not apparent to me that it's met here. Could you address that? Yes, Your Honor. Before this court, the company does some dispute that at the very time it notified employees that it knew of a union effort and that they should not support a union, it immediately grants a wage increase of between $0.50 to $2 an hour to employees. That can have a pretty immediate effect in how employees are going to view this incessant union campaign that's just beginning. There are a total of, I believe, seven unfriendly practices. That includes the discharge of McCarty, who is a prime union supporter, an interrogation of McCarty just as the union campaign is starting, and of course the discharge and an earlier warning given to Mr. Gretchen. So in context here, the board did not abuse its discretion by requiring a notice reading, and I would also point out that this court in some earlier cases had expressed concern when a board order did not give the option to have the company or the employer have the board agent read the notice instead of somebody from the employer, and here those concerns are not at issue because the board's order does give the option of either having Vice President Clark read the notice or having an agent from the board read the notice. But still the standard, I think, is so numerous, the ULPs are so numerous, pervasive and outrageous that such remedies are necessary to dissipate fully the coercive effects of the ULPs. What would you point to as the most outrageous action? Your Honor, immediately increasing wages when employees are told by the company, we know what's going on, we don't want you to support the union, there's no reason to support the union, and by the way, here's a wage increase. That kind of cuts the union effort off at its head, so to speak. It's very significant for a labor practice. Have you cited any other cases in which that's been a basis for a verbal warning or verbal notice? Sure, Your Honor. There's two cases that were cited in the board's brief that are particularly appropriate here. One is a case McAllister was telling that this court enforced, but I don't believe this court actually addressed the notice posting in that case. And that was a situation where an employer accelerated a wage increase, added some additional holidays, and the board had imposed a notice reading in that case. And there's also the D.C. Circuit federal logistics case where a high-level manager committed various unfair labor practices. And similarly, Vice President Clark was the person from the company who committed most of the unfair labor practices. And in that case, there was also a wage increase that was withheld. So those would be two cases that I would direct the court to. And just following up, what are the other egregious and pervasive infractions by this employer that would justify that extraordinary remedy? Well, Your Honor, in addition to the immediate wage increase, two of the leading union supporters, Mr. Gretchen and Mr. McCarty, were discharged Mr. Gretchen very early on in the campaign, Mr. McCarty a little bit later. And I know that the company has seemed to suggest that the union effort dissipated over time. And it's, again, not surprising that it did dissipate given some of the immediate actions taken by the employer. But having said that, the evidence does indicate that the union was continuing all the way until June of the following year, trying to organize but simply not having a lot of success. And in fact, to my recollection, within the first week of the union campaign before any of the unfair labor practices started, the union, or about 84 employees, had actually signed union cards. And after that wage increase, it dissipated very, very quickly. And going back to the McCarty incident, was there a supervisor that was identified as potentially responsible in the board's view? Your Honor, there were... Excuse me, I see that my time is up, but if I can continue answering the question. The board did not make a definitive finding as to who did it, but the board did recognize that there were only a handful of individuals that could have done so. And those individuals were in the main, if not entirely, supervisors. That's correct, Your Honor. And if I could just very quickly point out that Mr. McCarty did inform company management on two occasions prior to his suspension that his downtime was not being properly recorded. He was assured, don't worry, everything will be okay,  And I know your time has expired, but I'll ask the question and you get to answer it. Could you also just briefly address the substantial evidence supporting the determination that when McCarty was questioned by Clark, that constituted an interrogation? Yes, Your Honor. Three factors. First, Vice President Clark was a high-ranking company official. He initiated the conversation with McCarty. On that point, if I can interrupt, is there anything in the record to show, I mean I was struck by the difference in positions between Clark and McCarty, is there anything in the record to show whether they had had prior conversations, whether they spoke regularly or whether this was extraordinary? Your Honor, there's no indication that they spoke regularly and this was a chance encounter that occurred and this was essentially the very first thing that came out of Vice President Clark was what's going on with this union stuff. It was not part of a more general conversation or a broader interaction in this particular situation. Were there any other such questions? No. Any other questions about the union activity? In general, no. And in this particular situation, no. It was just a very direct question to Mr. McCarty, what's going on with this union stuff? It essentially came out of nowhere, so to speak. Thank you, Your Honor. The Board would simply ask that the Court enforce the Board's order. Thank you. First, with respect to the industrial engineers, two industrial engineers were to attend the meeting with Mr. Grecian. The other was Mr. Heatley, who had prepared extracts of Mr. Grecian's work records, production records, to bring to the meeting. So they were prepared. Mr. Heatley knew exactly what the meeting was about. Second, Mr. Grecian was specifically told that he would not suffer any adverse action at all. He was told, quote, we're not doing anything negative to you at the meeting. We're not doing anything at all. With respect to the reinstatement and back pay order for Mr. Grecian, there's no statutory authority to order reinstatement and back pay. The statute, Section 10C, is very clear on its face. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged or the payment to him of any back pay if such individual is suspended or discharged for cause. So even if you found, and the legislative history makes clear that where an employee is terminated for cause, they cannot be reinstated and back pay cannot be ordered, even if the wrongful conduct resulting in the termination involved an unfair labor practice. And that's very clear from the Anheuser-Busch case and it's clear from the Anheuser-Busch, you had an employer who had unlawfully installed surveillance cameras. Those surveillance cameras captured illegal drug activity. The employees were fired for the illegal drug activity, which would never have been discovered, but for the unfair labor practice in installing those surveillance cameras. The Board there held they were terminated for cause and even though it's related to this unfair labor practice, the statute prohibits an order of reinstatement and back pay. And Terracorp is the same way. Mr. Grecian was not terminated directly for an unfair labor practice. Even if you found that somehow a warning a week earlier, on October 1st, somehow led or contributed to his eventual termination, he was terminated for cause and therefore he cannot be ordered reinstated and back pay under the statute. The interrogation of Mr. McCarty clearly does not violate federal law. It was one comment to Mr. McCarty. There was no follow-up comment. What does the record show about the relationship between the two? The record shows, Your Honor, that they had a very good relationship. That's not disputed and it was focused on heavily by Chairman Mismera and his dissenting opinion. According to Ms. McCarty and his testimony, they had a very good relationship. Does it show how often they interacted? I believe they said they would interact as they saw each other on the floor, but that they had a good relationship, according to Mr. McCarty. The case relied upon for notice reading by the government is Federated Logistics. In that case, the president of the company held mandatory meetings and threatened every employee in the company that if they voted for a union, he would move the company to Hong Kong. He had every one of his managers go and threaten every employee. He told them, We're taking away your Christmas bonuses. We're taking away your Christmas leave. Vote for a union. Everyone in this place is going to get fired. That's not the facts in the Bazzuto's case. Notice reading is a humiliation here. It's an attempt to humiliate Mr. Clark, and it's being ordered on top of posting the notice for 60 days for everyone to see. It is an outrage. They are converting this rule of notice reading into a rule that's going to apply in every case. There were findings here that, if supported by substantial evidence, are serious. Two employees are removed from the company at the beginning stages of a union campaign, one of them on the basis of what the board determines are falsification of records regarding his productivity. Wouldn't evidence like that push in the direction of the majority's determination that this was egregious conduct? Thank you, Your Honor. I would say that it does not meet the standard of numerous pervasive and outrageous behavior, because if you look at McCarty, as soon as the company received the evidence that his record was falsified, he was ordered reinstatement with back pay. That's not the act of an outrageous act. That's an act of someone showing good faith. With Mr. Grecian, he was terminated only after extensive efforts to try to convince him to keep his job. That's not outrageous behavior. They tried over and over again. They said, please, just go to the meeting. Nothing's going to to happen if you don't do it. Those are the standards on a daily basis and cheat employees. Please, that's not outrageous behavior. Thank you. Thank you both.